IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | CASE NO: 3:06-CR-174-WKW |
| | ) | |
| JANICE MOSES | ) | |

## DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE AND/OR VARIANCE

**COMES NOW** the defendant, **JANICE MOSES**, by undersigned counsel, and moves this Court pursuant to 18 U.S.C. § 3553 and U.S.S.G. § 5K2.0 for a downward departure, or in the alternative, a variance to a sentence of probation, with no more than $35 restitution and $100 criminal assessment fee. This Motion is supported by the following:

### Facts

1.      Mrs. Moses pled guilty to Count 1 of this Indictment on December 22, 2006. (Doc. 23).

2.      Count 1 charged that on or about October 15, 2005, Mrs. Moses "did reproduce or distribute approximately 500 or more copies of various recordings or phonorecords with a total retail value of $2500 or more in a one-hundred-eighty day period, without the authorization of the copyright holder," in violation of 17 U.S.C. § 506(a)(1) and 18 U.S.C. § 2319(a) and (b)(1).

3.      Proof as to Count 1 would establish that Mrs. Moses was operating a flea market table at the Lee County Flea Market on October 15, 2005, when law enforcement officers appeared and found her to be in possession of 1,558 counterfeit CDs and a KLH

CDR/RW CD writer/player. (Presentence Report, paragraph 5). These items were offered for sale at $3.00 each.

4.    Without disclosing their law enforcement identities, officers made undercover purchases of two DVDs from Mrs. Moses - one on July 30, 2005 and one on October 8, 2005, for $3 each. The officers also observed her at the flea market – but did not make a purchase – on August 13, 2005. On October 15, 2005, Mrs. Moses was in possession of 1,152 counterfeit DVDs. However, this information does not establish proof of Count 1, the count of conviction, which involves solely CDs.

## Guidelines

5.    The Presentence Report has recommended that the base offense level of 8 be enhanced by 6 points for an alleged loss in excess of $30,000 and by 2 points for the "manufacture, importation, or uploading of infringing items." (Presentence Report, paragraphs 11 - 13; U.S.S.G. §2B5.3(b)(1)(B), (b)(3).)

6.    The Presentence Report also proposes restitution in an amount of $23,245.36 or $8,000. (Presentence Report, paragraph 59.)

7.    Mrs. Moses objects to these recommendations on the following grounds:

a.    The infringing items in this case "did not appear to a reasonably informed purchaser to be identical or substantially equivalent to the infringed item." As former Customs Agent James Duff's search warrant affidavit indicates, these items were visibly not genuine articles, did not contain paper labels and inserts comparable to genuine articles, in some instances used handwritten labels, and were marketed at substantially

below-retail market prices. Thus, the alleged price of the infringed genuine item should not be the "infringement value." Furthermore, U.S.S.G. § 2B5.3(C) provides that "the 'retail value' of an infringed item or infringing item is the retail price of that item in the market in which it is sold." Thus, the value to be used must be based on the price of the infringing item in the market in which it was sold.

        b.    <u>The alleged price of the genuine item is not established</u>. The Presentence Report recommends using a general figure suggested by two industry associations. (Presentence Report, paragraphs 6 and 7; Addendum, paragraphs 7, 10.) These associations are not the producers or sellers of the legitimate works involved in this case, nor are they the holders of the copyrights affected, or even the legal representatives of such individuals. No basis for these figures is provided.[1]

        c.    <u>No loss has been established, for purposes of restitution</u>. The Presentence Report recommends a figure of $8000 as restitution in this case, to be paid, not to the holders of the copyrights in this case but, to the Recording Industry Association of America. (Presentence Report, paragraph 59.) This figure includes the RIAA's

---

    [1]The Presentence Report indicates that the RIAA has requested to be present and provide expert testimony on "how loss is incurred involving theft of intellectual property." (Addendum, paragraph 10.) Respectfully, the defendant will object to such testimony. The defendant does not dispute this conduct is a criminal offense and does not debate the need for criminal penalties for this conduct. However, serious industry concerns are not relevant to the issues before this Court at this specific sentencing, which involves the CDs in this case and Mrs. Moses. The industry associations do not meet the statutory criteria for "persons permitted to submit victim impact statements" at this sentencing proceeding. By statute, such persons are limited to the actual "producers and sellers of legitimate works affected by conduct involved in the offense;" "holders of intellectual property rights in such works;" and "the legal representatives of such producers, sellers, and holders." 18 U.S.C. §2319(e)(2).

"investigation costs." Id. The Presentence Report takes the position that "loss occurs to the victim of copyright or trademark theft at the time of the copyright infringement." (Addendum, paragraph 9, 10). However, there is a difference between "infringement value" as an amount to be used in calculating the offense level, and "infringement value" as a loss actually experienced by a victim and due for restitution under the Mandatory Victims Restitution Act, 18 U.S.C. § 3363A, et seq.

There is no pecuniary loss where counterfeit items were seized before they were sold. *United States v. Adams*, 19 Fed. Appx. 33, 2001 WL 733504 (4th Cir. 2001) (holding defendant's victims incurred no pecuniary loss within the meaning of 18 U.S.C. § 3663A(c)(1), where bootleg videocassette tapes were confiscated before they were sold.)

Furthermore, the purpose of restitution has never been to provide a windfall to victims of crime. See *United States v. Nichols*, 169 F.3d 1255 (10th Cir.1999) and *United States v. Arutunoff*, 1 F.3d 1112, 1121 (10th Cir.1993)(citing *United States v. Rochester*, 898 F.2d 971, 983 (5th Cir.1990)("The VWPA's purpose is not to punish defendants or to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.").[2] A windfall will surely result to the victims in this case if Mrs. Moses were to be ordered to pay restitution for counterfeit items she never sold and which have been confiscated by law enforcement.

While Mrs. Moses violated the law when she possessed, for future distribution, copies

---

[2]The VWPA was the restitution statute, prior to the MVRA.

of copyrighted works, the copyright owners did not experience any monetary loss when those copies were <u>not</u> sold but were instead seized by law enforcement.    Mrs. Moses does not contest use of the unsold copies in determining her offense level.  However, she does contest their use as a measure of monetary loss for restitution purposes.

Under the Guidelines, the Court must enter a restitution order for the full amount of the victim's loss where the victim is identifiable.  U.S.S.G. § 5E1.1(a)(1).  "Victim" is defined by the Mandatory Victims Restitution Act as the person directly and proximately harmed by the defendant's actual conduct.  18 U.S.C. 3663A(a)(2).  "Actual loss" is defined at U.S.S.G. § 2B1.1, Application Note 3(A), as "the reasonably foreseeable pecuniary harm that <u>resulted</u> from the offenses."  (emphasis added.). Restitution may only be ordered to be paid to specific victims directly harmed by the defendant's conduct.  *United States v. Dickerson*, 370 F.3d 1330, 1339 (11th Cir. 2005).  "Relevant conduct," which may be considered for calculation of the offense level, is irrelevant to a restitution order unless it is also the conduct of conviction and caused direct harm to the victim.  *United States v. Rand*, 403 F.3rd 489, 494 (7th Cir. 2005); *United States v. Behrman*, 235 F.3d 1049, 1052 (7th Cir. 2000).  Consequential damages, such as general investigation costs, are not recoverable under the MVRA.  *United States v. Havens*, 424 F.3d 535, 538 (7th Cir. 2005).[3] Therefore, the copyright owners seeking restitution  for their loss in this case should be required to provide this Court with written statements evidencing their profits and losses and proving that any

---

[3]Moreover, the RIAA's "investigation" in this case was in partnership with local law enforcement and focused on many different sellers, in addition to Mrs. Moses.

profit loss was as a direct result of the sale of counterfeit items by Mrs. Moses.

d.    <u>The offense level enhancement for "manufacturing" overstates and "double counts" the seriousness of the offense, since Mrs. Moses is already receiving an enhancement based on electronic reproduction</u>. The Presentence Report recommends an additional 2 level enhancement to the offense level, because it takes the position that Mrs. Moses "manufactured" the counterfeit items. (Presentence Report, paragraph 13; Addendum, paragraph 12.)  As noted by the Presentence Report, Mrs. Moses possessed the ordinary equipment of a home computer station.  Her possession of a CD writer, which restricts reproduction to one or a few disks at a time, simply does not count as "manufacturing." Moreover, the Presentence Report presently recommends a substantial enhancement for "electronic reproduction," when it interprets the guidelines as requiring use of the retail value of the genuine items as the basis for the loss enhancement to the offense level.

e.    <u>Application Note 2(A)(i) to U.S.S.G. § 2B5.3 is an unreasonable interpretation and application of the Congressional directives regarding copyright infringement sentencing</u>.  The Presentence Report  relies on Application Note 2(A) in suggesting that the retail value of the infringed (genuine) item should be used to measure loss, where the infringing (counterfeit) item is "a digital or electronic reproduction of the infringed item." (Presentence Report, paragraph 6.)  However, use of the retail price of the genuine items overstates the actual harm of this offense and ignores the Sentencing Commission's own findings.

The Sentencing Commission has amended the copyright infringement guideline, U.S.S.G. § 2B3.5, several times, in response to legislation directing review of these sentencing guidelines. In 1997, section 2(g) of the No Electronic Theft Act of 1997 ("NET"), Pub. L. 105-147, directed the Commission as follows:

> (1) . . . . the United States Sentencing Commission shall ensure that the applicable guideline range for a defendant convicted of a crime against intellectual property . . . is sufficiently stringent to deter such a crime and to adequately reflect the additional considerations set forth in paragraph (2) of this subsection.
>
> (2) In implementing paragraph (1), the Sentencing Commission shall ensure the guidelines provide for consideration of the retail value and quantity of the items with respect to which the intellectual property was committed."

The NET was apparently passed in response to a software piracy problem, not present in this case, which had been identified in *United States v. LaMacchia*, 871 F.Supp. 535 (D. Mass. 1994).[4] Savage & Barclay, "When the Heartland is 'Outside the Heartland:' the New Guidelines for NET Act Sentencing," 9 Geo. Mason L. Rev. 373, 377 (Winter 2000).

In response to this legislation, the Sentencing Commission created a No Electronic Theft Act Policy Development Team, which issued its report in February 1999. Thereafter, the Commission adopted emergency Amendment 590, effective May 1, 2000, and its

---

[4]In *LaMacchia*, the district court dismissed a criminal copyright indictment against an M.I.T. student who had established a computer bulletin board system for sharing copyrighted software and games, because the copyright infringement law at that time did not criminalize behavior undertaken for no financial gain. 871 F.Supp. at 545.

identical permanent version, Amendment 593, effective November 1, 2000.[5]

Amendments 590 and 593 replaced the phrase "retail value of infringing item" with the phrase "infringement amount" and provided several alternative definitions of that amount. Amendments 590 and 593 each include an identical statement of the "Reason for Amendment," which notes that each amendment is in response to section 2(g) of the NET. The "Reason for Amendment" discusses the Amendment's "modifications to the infringement guideline," as including "the addition of several mitigating and aggravating factors, as further means of providing just and **proportionate** punishment while also seeking to achieve sufficient deterrence." (U.S.S.G., Appendix C, Amendment 590, "Reason for Amendment," second paragraph.) (emphasis added.) The "Reason for Amendment" states that the amendment "responds to the [legislative] directives" by changing "the monetary calculation" of the U.S.S.G. § 2B3.5, to use the value of the infringed item. "Use of that calculation is believed to provide a reasonable approximation **for those classes of**

---

[5]Four more amendments were made to U.S.S.G. § 2B3.5, none of which are pertinent to the issues in this case. In 2001, the Sentencing Commission consolidated the theft and fraud guidelines, which changed the cross-reference to loss in §2B3.5 from the loss table in §2F.1 to the table in §2B.1 (Amendment 617). On October 24, 2005, in response to the Family Entertainment and Copyright Act of 2005, Pub.L. 109-9, the Commission promulgated emergency Amendment 675. Amendment 675 added a new (b)(2) to U.S.S.G. §2B3.5, to address punishment of "pre-release" reproduction of works before their distribution was authorized by the copyright owner and added Note 1 to the Application notes, defining "uploading" for purposes of punishing distribution over the Internet. On September 12, 2006, the Commission adopted another emergency amendment, No. 682, in response to the Stop Counterfeiting in Manufactured Goods Act, Pub.L. 109-181. This amendment added section (vii) to Application Note 2A, regarding punishment where the infringement involved counterfeit packaging or anti-circumvention devices. Finally, on November 1, 2006, the Commission added Amendment 687, which repromulgated Amendment 675 as a permanent change.

**infringement cases in which it is highly likely that the sale of an infringing item results in a displaced sale of the legitimate, infringed item."** (Id., third paragraph.) (emphasis added).

The Sentencing Commission specifically excepted certain circumstances from use of this infringing item price. As stated in the "Reason for Amendment:"

> However, based upon a review of cases sentenced under the former § 2B5.3 over two years, the Commission further determined that using the above formula likely would **overstate substantially** the pecuniary harm caused to copyright and trademark owners in some cases currently sentenced under the guideline. For those cases, a one-to-one correlation between the sale of infringing items and the displaced sale of legitimate, infringed items is unlikely because the **inferior quality** of the infringing item **and/or the greatly discounted price** at which it is sold suggests that many purchasers of infringing items would not, or could not, have purchased the infringed item in the absence of the availability of the infringing item. The Commission therefore determined that, for these later classes of cases (referred to in Application Note 2(B)), the **retail value of the infringing [counterfeit] item**, multiplied by the number of those items, provides a more reasonable approximation of lost revenues to the copyright or trademark owner, and hence, of the pecuniary harm resulting from the offense.

(U.S.S.G., Amendments 590 and 593, Reason for Amendment, fourth paragraph.) (Emphasis added.).

These findings echo the conclusions of the Commission's NET Policy Development Team, which concluded:

> **The Team, however, found no evidence of a one-to-one correlation between sales of infringing items and lost sales to the intellectual property owners. The economists and industry representatives with whom the Team consulted uniformly agreed that one cannot credibly claim that such a relationship generally exists.** Moreover, in the civil context

(particularly patent infringement cases), very detailed and protracted expert testimony is generally required to prove any lost sales.

The Team's review of FY 1996 and FY 1998 cases sentenced under §2B5.3 also suggests that the **sale of infringing items does not cause a one-to-one displacement of legitimate sales**. The majority of cases involve consumers who purchase counterfeit designer trademarked goods at a fraction of the price of their legitimate counterparts and/or in settings that suggest that the purchasers know they are not buying the genuine article (e.g., a flea market). **In other words, consumers generally know they are buying illegally trafficked articles and yet do so anyway (one would presume because of the price disparity). The consumer's complicity and the large disparity between the retail price of the infringed-upon item and the infringing item suggest that the consumer would not (or could not) have purchased the legitimate good if the infringing item had not been available.**

Of course, the composition of guideline cases may change. **But even in cases that do not involve counterfeit designer goods, a one-to-one lost sales correlation cannot be shown**. As described above, industry representatives report that software, for example, that retails for thousands of dollars routinely is distributed on the Internet at no cost. **The same is true for audio materials and soon will be true for videos.** . . .

(U.S. Sentencing Commission, No Electronic Theft Act Policy Development Team Report, February 1999, pp. 21 - 23.) (Emphasis added.)

Although Application Note 2(A) sets out seven situations in which the infringement amount is determined by the retail value of the genuine item, Application Note 2(B) applies the retail value of the counterfeit item to  all other situations.  These other situations are defined as "any case not covered in subdivision (A) of this Application Note." For these cases, the Commission "determined that use of the retail value of the infringed item would **overstate the pecuniary harm or otherwise be inappropriate**." (U.S.S.G. § 2B5.3,

Background, second paragraph.) (Emphasis added.)

By default, the circumstances which fall into Application Note 2(B) are ones excluded from Application Note 2(A). Thus, the counterfeit item's price is to be used for the "infringement value" where the counterfeit items don't appear to be substantially identical or substantially equivalent to the genuine item, (2)(A)(i); or have a retail price less than 75% of the genuine item's price, (2)(A)(ii);[6] or have a price that is easy to determine, (2)(A)(iii);[7] or do not involve infringement of satellite cable transmissions, (2)(A)(iv); or do not provide "a more accurate assessment of the pecuniary harm to the copyright or trademark owner," (2)(A)(v);[8] or do not involves theft of pre-release material, (2)(A)(vi); or do not involve counterfeit packaging, (2)(A)(vii).

In *United States v. Guerra*, 293 F.3d 1279, 1292 (11th Cir. 2002) the appellants were convicted of trafficking in counterfeit cigars. The appellants had offered evidence at sentencing of the amount that they charged for the counterfeit cigars; in some instances this

---

[6]In this case, the $3 DVDs and CDs are less than 20% of the purported retail price of genuine DVDs (allegedly $19) and genuine CDs (allegedly $14).

[7]The Policy Development Team Report specifically noted that "(t)he infringing value most likely will be readily discernable from the investigation of the offense; law enforcement officers usually know exactly how much the infringing goods were being (or are typically) sold for." Report, p.23. In the present case, the investigating officers made repeated undercover purchases for $3 each.

[8]The Policy Development Team Report notes that "Even if a one-to-one correlation in lost sales can be shown, the infringed-upon value overstates the harm from a lost sale because it does not account for costs associated with developing, producing and distributing the legitimate item." The Report gives the example of production expenses which reduce to $10 the net profit on a Ralph Lauren shirt retailing for $50. Report, page 22.

price was almost $3 cheaper than the $4 amount charged for genuine cigars.  The district court denied this request and used the price of the genuine items.  The Eleventh Circuit reversed and remanded the matter,  so that "the district court will have the opportunity to decide if the $4.00 is the appropriate retail value of the counterfeit, not genuine, merchandise."  293 F.3d at 1292.

In *United States v. Larrcuente*, 952 F.2d 672 (2nd Cir. 1992),  the appellant was convicted of trafficking counterfeit movie videotapes from a store he owned. On appeal, the appellant challenged his sentence, in part, "on the ground that the value of the bootleg tapes under the Sentencing Guidelines should have been based on their price in the market for bootleg tapes." 952 F.2d 673.  The appellant offered evidence that the bootleg movies sold for $10 to $15.  The Second Circuit held that the district court had correctly calculated the retail value based on the normal retail price of a genuine movie videotape, rather than the lower bootleg price, but only because the counterfeit copies were "prepared with sufficient quality to permit their distribution through normal retail outlets."  The Court noted "We would have a different question if the infringing items were of obviously inferior quality and were for that reason distributed to consumers who pay far less than the retail price for authentic items."  952 F.2d at 674-675.

These cases support flexibility by the Court in considering the prices of both the counterfeit and the genuine, when determining the "infringement value.  Moreover, the counterfeit  items in the present case fit into the exceptions covered by Application Note

2(B).  To require the substantially higher genuine price to be used, simply because electronic reproduction is involved, ignores all of the findings made by the Commission,  the Commission's own comments that the intention is to avoid "overstat[ing] the pecuniary harm," (U.S.S.G. § 2B5.3, Background, second paragraph), and established case law.

<u>**Variance or Departure**</u>

8.     As noted in the Presentence Report, Mrs. Moses has objected to the above recommendations.  Mrs. Moses respectfully requests that, if the Court is inclined to overrule her objections, the Court also consider this pleading as a Motion for Downward Departure and/or Variance From the Guidelines.

9.     Pursuant to United States Sentencing Guideline § 5K2.0, a downward departure may be warranted where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in the formulating of the guidelines," and thus outside the "heartland" of cases covered by a particular guideline provision.  18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0.  Commentators have noted that the NET-related guidelines are themselves "outside the heartland."  Savage & Barclay, "When the Heartland is 'Outside the Heartland:' the New Guidelines for NET Act Sentencing," 9 Geo. Mason L. Rev. 373, 377 (Winter 2000).

10.    In addition, while the Eleventh Circuit has indicated that the sentencing guidelines remain "an important sentencing factor," that Court has also not disapproved the clearly expressed desire of some district courts to impose a more lenient sentence under

merely advisory guidelines.  See, e.g., *United States v. Martinez*, ___ F.3d ___, 2005 WL 995341, at 3 (11th Cir. Apr. 29, 2005).  Therefore, the Court may still impose a sentence of probation pursuant to 18 U.S.C. § 3553(a) and *United States v. Booker*, 125 S.Ct. 738 (2005).

11.    In this case, Mrs. Moses has no prior record (Presentence Report, paragraphs 21, 22).  While she has only a high school education and a nursing assistant certificate (Presentence Report, paragraph 30), she has maintained continuous employment (Presentence Report, paragraphs 31 to 40.)  Her activity in this case was confined to part time, weekend-type flea market sales, to supplement her marginal income. A felony conviction and the close supervision of the U.S. Probation Office will both punish this conduct and ensure that it is not repeated.

12.    In addition, as discussed above, under the unique circumstances of this case, the proposed application of the sentencing guidelines offense level provisions is unreasonable.  As discussed in Commentary to the Guidelines, a Report by the Sentencing Commission, and a law review article, the guidelines were intended to avoid overstating the pecuniary harm of this offense.  Instead, by relying on the mere home-made ability to use a home computer system to make an "electronic reproduction," the Guidelines seemingly overstate the actual harm and seemingly urge the Court to ignore the Commission's own wisdom on this matter.

Under all of the above circumstances, a departure and/or variance to probation is a reasonable sentence.

Respectfully submitted,
**s/Christine A. Freeman**
**CHRISTINE A. FREEMAN**

**TN BAR NO.: 11892**
Federal Defenders

Middle District of Alabama

201 Monroe Street, Suite 407

Montgomery, AL 36104

TEL:  (334) 834-2099

FAX:  (334) 834-0353

E-Mail: Christine_Freeman@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2007, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to

the following: Verne Speirs, Esquire, Assistant United States Attorney, One Court Square,

Suite 201, Montgomery, Alabama 36104.

**s/Christine A. Freeman**
**CHRISTINE A. FREEMAN**
**TN BAR NO.: 11892**
Federal Defenders
Middle District of Alabama
201 Monroe Street, Suite 407
Montgomery, AL 36104
TEL:  (334) 834-2099
FAX:  (334) 834-0353
E-Mail: Christine_Freeman@fd.org